United States Court of Appeals,

Eleventh Circuit.

No. 95-4224.

UNITED STATES of America, Plaintiff-Appellee,

v.

Coley QUINN, Defendant-Appellant.

Oct. 3, 1997.

Appeal from the United States District Court for the Southern District of Florida. (No. 93-8048-CR-KLR), Kenneth L. Ryskamp, Judge.

Before BARKETT, Circuit Judge, KRAVITCH, Senior Circuit Judge, and HARRIS[*], Senior District Judge.

HARRIS, Senior District Judge:

Appellant Coley Quinn was charged with conspiring to possess cocaine hydrochloride (powder cocaine) with the intent to distribute it, and that it was a further purpose of the conspiracy to manufacture and distribute cocaine base (crack cocaine), in violation of 21 U.S.C. § 846; possessing cocaine hydrochloride with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; and with using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) and 18 U.S.C. § 2. Two codefendants, John Ruff, Jr., II, and John Ruff, Jr., III, [sic] also were charged in all counts.

Quinn and his codefendants pled guilty. Quinn thereafter was permitted to withdraw his guilty plea, proceeded to trial, and was found guilty as charged.

Prior to sentencing, Quinn filed a motion challenging the constitutionality of the enhanced penalties for crack cocaine and asserting that he had been selectively prosecuted because of his race. The district judge consolidated the motion with respect to the crack cocaine penalties with a similar motion filed in another of his cases, *United States v. Hickman,* No. 93-14021-CR-KLR, and, after

---

[*]Honorable Stanley S. Harris, Senior U.S. District Judge for the District of Columbia, sitting by designation.

a joint hearing, denied the motion to deem the penalties unconstitutional and denied a request for discovery in connection with the selective prosecution claim.

The district court sentenced Quinn to concurrent 235-month terms of incarceration on Counts One and Two, a consecutive 60-month term of imprisonment on Count Three, and five years of supervised release.

## I. Background

Coley Quinn and his two codefendants, John Ruff, Jr., II, and John Ruff, Jr., III, were arrested on April 14, 1993. A confidential informant had told Drug Enforcement Administration ("DEA") agents that he had information about a drug ring that was distributing crack cocaine. At the direction of the agents, the informant telephoned the younger Ruff to arrange the sale of two kilograms of cocaine to the group for $35,000. Quinn answered the phone and said that they wanted to do the deal immediately. Later in the day, the informant called the younger Ruff and agreed to meet with Quinn in a shopping center parking lot. Quinn arrived at the scene of the transaction, left his car, and walked a distance of approximately 50 to 60 feet to the informant's vehicle.

The informant taped their conversation. Quinn said that everything was ready and that he had seen the money, but that the Ruffs wanted to check the "shit" by "cook[ing] some."[1] Quinn and the informant arranged for the Ruffs to buy the cocaine conditionally and to "cook" some before giving final approval; Quinn described one of the Ruffs as "the greatest guy cooking wise." The informant told Quinn that each of them would receive $1,500 for arranging the deal, and Quinn again said that he wanted to close the deal promptly.

The Ruffs arrived thereafter, asked if "Coley" had explained the transaction, displayed the purchase money to the informant, and confirmed the procedure for the deal. The informant called Officer Patrick Flannery of the City of West Palm Beach Police Department, who was posing as the drug courier. Flannery arrived in a Toyota Camry; Quinn and the younger Ruff got into the car and

---

[1]Crack cocaine is made by converting cocaine hydrochloride to base form, and "cooking" refers to the process used to transform cocaine hydrochloride into cocaine base, commonly known as crack.

exchanged the money for the cocaine. They were arrested. The police also arrested a juvenile who was sitting in Quinn's car and apprehended him with a loaded gun.

Quinn and the Ruffs were transported to a DEA office. Quinn was advised of his *Miranda* rights and gave a statement. According to the agents, Quinn said that he had introduced the informant to the Ruffs after learning that the informant had access to cocaine, that the elder Ruff, in Quinn's presence, had told the informant that he was in the business of making crack and needed high quality cocaine for that purpose, and that Quinn had seen the informant several times during the next year and they had discussed working together in the future, eventually leading to the transaction at issue here. Quinn also stated that he had brought the gun for "self-protection," that he had pulled off I-95 on the way to the drug deal to check the weapon, and that he had placed the gun between the two front seats of his car and had covered it with a towel. Quinn also offered to become an informant. He said that he had worked for the Federal Bureau of Investigation ("FBI") in the past and gave the name of FBI Special Agent Larry Doss to support this. Quinn also stated that he was not working for Doss at the time of the arrest and that he had gotten involved in the transaction for the money.

Quinn moved to suppress his post-arrest statement as involuntary, contending that it had been coerced by a false statement that he was facing 40 years in prison. The motion was denied. Prior to trial, pursuant to Federal Rule of Criminal Procedure 12.3, Quinn filed a notice of his intent to assert as a defense his belief that he was acting in accordance with public authority.

The case proceeded to trial, and the government called several law enforcement officers to testify about both the transaction and Quinn's confession. On the second day of trial, the government announced its intent to call a previously undisclosed witness, DEA Agent Robert Mangiamele, to testify about an alleged second post-arrest statement made by Quinn that he was involved in the instant transaction for profit and not as an informant. Quinn objected, and the trial judge restricted Mangiamele's testimony to rebuttal.

3

Quinn testified that he had met the informant through his employer and had introduced him to the Ruffs, who wished to do a drug deal. He began to feel that he was involved in the deal too deeply, called the FBI, and was referred to Agent Doss. The two met; Quinn provided some information on suspected drug figures, and asked for money. Doss told Quinn to keep him informed and to make sure his drug contacts were not connected with the DEA. Quinn contacted Doss again in December 1992, and Doss again told Quinn to keep him informed. Doss previously had told Quinn that he did not want to do any deals for less than five kilograms of cocaine, and Quinn allegedly said that doing so would require a number of preliminary transactions in order to gain the drug dealers' confidence. Doss told Quinn to contact him when he reached the five-kilogram level. Quinn further testified that he contacted Doss again in March 1993 to tell him about a one-kilogram deal involving the younger Ruff, but that he did not have the address for the house where Ruff had picked up the cocaine. Doss told Quinn that he could not get a search warrant without an address, and Quinn said that he would have to do another drug deal to get it. On April 12, 1993, the informant contacted Quinn about the instant deal; Quinn did not discuss the April transaction with Doss because they had already discussed Quinn's building up to a five-kilogram deal.

Quinn also testified that, at about the time he initiated his contact with Doss, he had told two other people that he was contacting the FBI and hoped to work for that agency. First, in a conversation at a Costco store, he spoke with his longtime acquaintance, John Flint of the Palm Beach Sheriff's Department, and told him that he planned to work for the FBI and asked for advice on how to approach Doss. Second, Quinn spoke with an HRS caseworker to seek assistance in paying his rent, and he mentioned that he hoped to work as an informant for the FBI. Quinn wanted to call Flint as a witness, but the government objected and the trial court did not allow Flint to testify. The HRS case worker did testify for the defense.

At the conclusion of the government's case, Quinn moved for a judgment of acquittal on the § 924(c) count on the ground that there was insufficient evidence that his gun was used to facilitate

4

a drug trafficking crime. The trial judge denied the motion, stating: "They don't have to use the gun in the transaction. If it is available, could have been used, that's all that's required."

On rebuttal, Agent Doss testified that Quinn had never told him about the Ruffs or a one-kilogram deal in Miami, and that he had not encouraged Quinn to get involved in drug deals and then tell Doss about them later. DEA Special Agent Nicholas Kent and West Palm Beach Police Officer John Kelly testified that Quinn stated that he had participated in the drug deal for the money, and not as an FBI informant. DEA Special Agent Mangiamele testified that both Doss and Quinn had told him that Quinn had not been working for the FBI at the time of the arrest, and that Quinn had said that he had arranged the deal for the money.

## II. Analysis

*A. The Exclusion of John Flint's Testimony*

Quinn contends that the district court incorrectly excluded Flint's proffered testimony. Flint, of the Palm Beach Sheriff's Department, was Quinn's long-time acquaintance and had had a discussion with Quinn in a Costco store. Quinn testified about this conversation. The government objected to Flint's testimony on the ground that it would be hearsay, and the court excluded it.

The parties disagree initially about the applicable standard of review. The government contends that a plain error standard applies because appellant did not preserve his objection by making an offer of proof to the district court, pursuant to Federal Rule of Evidence 103(a)(2); appellant urges us to apply an abuse of discretion standard.

Rule 103(a) provides, in relevant part, that "[e]rror may not be predicated upon a ruling which ... excludes evidence unless a substantial right of the party is affected, and ... (2) .... the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."

Rule 103(a)(2) does not require that a formal offer of proof be made to preserve an objection. *United States v. Sweiss,* 814 F.2d 1208, 1211 (7th Cir.1986). Where the substance of the evidence is apparent to the court from its context, an appellant is entitled to ordinary appellate

5

review of a ruling excluding evidence. Here, that burden was satisfied because the prosecutor was informed in advance of Quinn's intent to call Flint, objected immediately when Flint's testimony was proffered, and explained to the court that Flint was going to testify to a certain conversation and that the government believed it to be hearsay.[2] Moreover, Quinn discussed this conversation during his own testimony. Accordingly, we conclude that an abuse of discretion standard applies. *See United States v. Sheffield,* 992 F.2d 1164, 1170 (11th Cir.1993) ("[B]ecause the trial court and prosecutor were well aware of the substance of the evidence, and the record reflects the substance of the evidence, we find that the defense counsel made an adequate proffer").

Flint was expected to testify about a conversation he had with Quinn in which Quinn asked Flint about becoming an informant for the FBI.[3] Quinn contends that Flint's testimony would have corroborated his defense that he believed he was acting under public authority when he made the drug deal, and therefore lacked the requisite criminal intent. Quinn contends here, as he did before the district court, that (1) the statements are not hearsay, and (2) even if they are hearsay, they should have been admitted under either the state of mind exception to the hearsay rule, Federal Rule of Evidence 803(3), or under the "catch-all" provision in Rule 803(24).

We conclude that the district court was incorrect in determining that the statements were hearsay. Rule 801(c) defines "hearsay" as "a statement ... offered in evidence to prove the truth of the matter asserted." Here, the statements were not offered for their truth, *i.e.,* that Quinn was then working or was going to work for the FBI. *See United States v. Harris,* 733 F.2d 994, 1004 (2d

---

[2]The prosecutor stated: "[I]t is our belief he is going to ... elicit from the witness a conversation that the witness had with the defendant at Costco sometime before the defendant was arrested in which the defendant said to the witness ... "I'm working for the FBI or I'm going to be working for the FBI,' and that is just rank hearsay...."

[3]In relevant part, Quinn stated: "I told Johnnie Flint that at Costco at the same time when I asked him about Larry Doss, who was Larry Doss. I asked John Flint about how I should approach the FBI, how should I deal with them. He is the only one that informed me on asking them for a contract.... [M]y conversation with John Flint was to find out about the FBI. I was trying to get myself familiar with how the FBI system worked...."

Cir.1984). Because we conclude that the offered statements were not proscribed "hearsay," we need not address the parties' arguments about exceptions to the hearsay rule.

The exclusion of this testimony, however, did not affect a substantial right of appellant. *See* Fed.R.Evid. 103(a) and Fed.R.Crim.P. 52(a). Flint's testimony, as discussed above, was offered to establish that Quinn intended to contact Doss about becoming an informant. There was, however, no dispute that Quinn had this intention and acted upon it. Moreover, the testimony would have been merely cumulative; Agent Doss and Quinn already had testified about their conversations, and the HRS caseworker testified that Quinn had told him that he intended to work as an FBI informant. Accordingly, we conclude that the exclusion of Flint's testimony was harmless error.

*B. The Brady/Giglio Issue*

Quinn filed a pretrial motion requesting that the trial court order the government to disclose the personnel files of the testifying officers for impeachment purposes. The court granted the motion "within the scope of the Standing Discovery Order."[4] Quinn then filed a motion for clarification, asking the court to "rule definitively as to ... whether the Government must review personnel records of law enforcement officers." The district judge referred the motion for clarification to a United States Magistrate Judge, who issued an order denying the motion and stating that the government was

> obliged to furnish counsel with *Brady* and *Giglio* material. Failure to comply with this obligation could result in the imposition of severe sanctions. This Court declines to instruct

---

[4]The Standing Discovery Order provided in relevant part:

> The government shall reveal to the defendant and permit inspection and copying of all information and material known to the government which may be favorable to the defendant on the issues of guilt or punishment within the scope of *Brady v. Maryland,* 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, and *United States v. Agurs,* 1976, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342.

> The government shall disclose to the defendant the existence and substance of any payments, promises of immunity, leniency, preferential treatment, or other inducements made to prospective government witnesses, within the scope of *Giglio v. United States,* 1972, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104, and *Napue v. Illinois,* 1959, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217.

the Government on the manner in which to discharge its obligations under the Standing Discovery Order.

The district judge read the magistrate judge's order aloud at an April 7, 1994, hearing on Quinn's two suppression motions. He then stated:

> As far as personal [sic] records go, the government has to see if they're ... *Brady* or *Giglio* .... Everybody knows that.... And I'm not going to tell the government what it has to do. One thing to clarify my position is that the government should be reviewing those records to determine whether this is *Brady* material at sight, not just to necessarily hand them over.

The prosecutor stated that she understood the court.

Quinn contends that the district court failed to ensure that the government adequately complied with its order with respect to the personnel records of testifying law enforcement officers. We review this issue *de novo. See United States v. Mejia,* 82 F.3d 1032, 1036 (11th Cir.), *cert. denied,* --- U.S. ----, 117 S.Ct. 188, 136 L.Ed.2d 126 (1996); *Delap v. Dugger,* 890 F.2d 285, 298 (11th Cir.1989), *cert. denied,* 496 U.S. 929, 110 S.Ct. 2628, 110 L.Ed.2d 648 (1990).

In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that the failure of the prosecution to turn over evidence favorable to the defendant on the issue of guilt violates due process. *Id.* at 87, 83 S.Ct. at 1196-97. Included among the evidence that *Brady* obligates the prosecution to disclose is "evidence affecting credibility." *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). On the other hand, the Supreme Court has made it clear that the *Brady* rule is not an evidentiary rule that grants broad discovery powers to a defendant and that "[t]here is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977).

Here, the district judge required the government to comply with *Brady* and *Giglio,* and stated that the government was required to review the personnel files to determine whether they contained *Brady* or *Giglio* material. Quinn, however, contends that "*Brady* and *Giglio* are not sufficient to insure that a defendant will be able to ascertain whether material exists in the personnel records of federal law enforcement officers that should cast legitimate doubt as to their credibility." Quinn thus

8

urges us to follow *United States v. Henthorn,* 931 F.2d 29 (9th Cir.1991), which holds that when a defendant requests the personnel files of testifying officers, the government must examine them and disclose material information that is favorable to the defense, and that if the government is uncertain about the materiality of the information, it may submit the information to the trial court for in camera review.[5] *Id.* at 30-31. The *Henthorn* court further held that a defendant need not make an initial showing of materiality; the government's obligation to examine the files arises by virtue of a defendant's demand for their production.[6] *Id.* at 31. We decline to follow *Henthorn.*

Quinn has offered no support for his contention that the personnel files might contain information of significance to his case; nevertheless, he argues that the government should have been required to disclose the contents of the files or produce the files for the district court's inspection. In *United States v. Pitt,* 717 F.2d 1334 (11th Cir.1983), *cert. denied,* 465 U.S. 1068, 104 S.Ct. 1421, 79 L.Ed.2d 746 (1984), however, this court rejected that argument and held that because a defendant had failed to demonstrate that the contents of an FBI agent's file contained material evidence, the district court did not err in refusing to order the prosecution to turn over the file. *Id.* at 1338-39. Other circuits also have rejected this argument. In *United States v. Andrus,* 775 F.2d 825 (7th Cir.1985), the Seventh Circuit held:

> " Mere speculation that a government file may contain *Brady* material is not sufficient to require a remand for *in camera* inspection, much less reversal for a new trial. A due process standard which is satisfied by mere speculation would convert *Brady* into a discovery device and impose an undue burden upon the district court."

*Id.* at 843 (quoting *United States v. Navarro,* 737 F.2d 625, 631 (7th Cir.), *cert. denied,* 469 U.S. 1020, 105 S.Ct. 438, 83 L.Ed.2d 364 (1984)). The Sixth Circuit also has rejected the argument,

---

[5]Appellant further interprets *Henthorn* as holding that the government must, after examining personnel files upon a defendant's request, certify in good faith that it has done so. We, however, see no such certification requirement in that case. We also observe that Quinn did not request such a certification by the government in the district court.

[6]The Ninth Circuit subsequently clarified that, under *Henthorn,* an Assistant United States Attorney ("AUSA") may not be ordered by a district court to conduct the examination personally; rather, the appropriate agency may examine its files and notify the AUSA of any potential *Brady* material. *See United States v. Herring,* 83 F.3d 1120 (9th Cir.1996).

citing *Andrus* and *Pitt. See United States v. Driscoll,* 970 F.2d 1472, 1482 (6th Cir.1992) (upholding government's refusal to disclose testifying officers' personnel files based only on defendant's speculation that files contained material useful to impeach officers' credibility), *cert. denied,* 506 U.S. 1083, 113 S.Ct. 1056, 122 L.Ed.2d 362 (1993). Quinn's speculative claim falls into the same category as the claims rejected in *Pitt, Andrus,* and *Driscoll,* and we conclude that the district court did not err by not providing further relief.

*C. The Admission of Agent Mangiamele's Testimony*

At the beginning of the second day of the three-day trial, the AUSA notified the court that she and the case agent, Kent, had learned the previous evening of a post-arrest statement Quinn had made to Agent Mangiamele, in which Quinn stated that he was not working for Agent Doss at the time of the arrest and that he participated in the drug transaction for money. (This statement was made at a different time than the similar statement made in the presence of Agent Kent and Officer Kelly.)

Defense counsel objected to the admission of this testimony on the ground that Mangiamele's name and the substance of his testimony had not been disclosed to Quinn prior to trial pursuant to Federal Rules of Criminal Procedure 12.3(a)(2) and 16(a)(1)(A), and the Standing Discovery Order. The district court permitted the testimony as rebuttal on the ground that it was merely corroborative. Quinn argues that his defense was prejudiced by the admission of this testimony, which with more time he might have been able to have excluded.

Rule 12.3(a) requires the government to give notice of any witness who may contradict a public authority defense. Rule 16(a)(1)(A) requires the government to disclose any oral statement made by the defendant to a government agent that the government intends to offer as evidence at trial. Both rules require the government to make prompt disclosure, before or during trial, of information of which it learns after giving the initial notice. Fed.R.Crim.P. 12.3(b) & 16(c).

"[A] discovery violation does not automatically preclude the government's use of the evidence at trial." *United States v. Accetturo,* 966 F.2d 631, 636 (11th Cir.1992), *cert. denied,* 506

10

U.S. 1082, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993). Moreover, we will reverse a conviction based on the government's violation of a discovery order only if the defendant has demonstrated that the violation "prejudiced his substantial rights." *United States v. Rivera,* 944 F.2d 1563, 1566 (11th Cir.1991).

Here, Mangiamele's testimony was cumulative of the testimony presented by Kent and Kelly, who testified that Quinn had told them that he had not been working for the FBI prior to his arrest, but instead had participated in the drug deal for the money. We therefore readily conclude that Mangiamele's testimony did not prejudice Quinn's substantial rights. *See id.* at 1566-67.

*D. The Proposed Entrapment Instruction*

Quinn contends that the district court erred by denying his request for an entrapment instruction. He asserts that a defendant is entitled to an instruction on any defense theory with some basis in the evidence and legal support, citing *United States v. Hedges,* 912 F.2d 1397, 1406 (11th Cir.1990) (regarding jury instruction on entrapment by estoppel), and contends that his testimony demonstrated that Agent Doss induced him to participate in the drug transaction.

Entrapment is an affirmative defense, evidence of which must be presented before the issue is considered to be properly raised. *United States v. Gates,* 967 F.2d 497, 499 (11th Cir.), *cert. denied,* 506 U.S. 1011, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992). The defendant has the "initial burden of producing evidence, or of pointing to substantial evidence" showing government involvement or inducement. *United States v. Parr,* 716 F.2d 796, 802 (11th Cir.1983). To satisfy this burden,

> [t]he defendant must demonstrate not merely inducement or suggestion on the part of the government but "an element of persuasion or mild coercion."... The defendant may make such a showing by demonstrating that he had not favorably received the government plan, and the government had had to "push it" on him, ..., or that several attempts at setting up an illicit deal had failed and on at least one occasion he had directly refused to participate....

*United States v. Ventura,* 936 F.2d 1228, 1233 (11th Cir.1991) (internal citations omitted in text), quoting *United States v. Andrews,* 765 F.2d 1491, 1499 (11th Cir.1985), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986). In determining the sufficiency of the evidence, we view the

11

evidence in the light most favorable to the accused. *Gates,* 967 F.2d at 499; *Parr,* 716 F.2d at 802. Applying the law to the facts presented here, Quinn indicated no reluctance to get involved in the drug deal. Nor is there any evidence that Agent Doss persuaded or coerced him in any way. Evidence that the agent merely did not discourage Quinn from participating in the venture is insufficient to entitle Quinn to an entrapment instruction. Because Quinn failed to come forward with evidence sufficient to raise a jury issue of entrapment, we conclude that the district court correctly refused to instruct on entrapment.

*E. Quinn's Motion To Suppress His Post-Arrest Statements*

Quinn filed a pretrial motion to suppress his statements to Agent Kent on the grounds that Kent made improper inducements and threats to him and discouraged his obtaining an attorney. At the hearing, Quinn testified that he had been told that he was facing a 40-year sentence but might receive a more favorable sentence if he cooperated. He testified that he also had been told that it would be difficult to cooperate once an attorney had been appointed. He also suggested that he had not properly been advised of his *Miranda* rights; he stated that although his rights were read to him orally, the written waiver form that he signed had been obscured.

Agent Kent testified that the issue of the potential sentence arose only after Quinn asked Kent about it, and that he made a accurate estimate of Quinn's potential sentence: he predicted 25 years, and Quinn ultimately was sentenced to a 295-month term of incarceration.[7] "[D]iscussions of realistic penalties ... are normally insufficient to preclude free choice." *United States v. Mendoza-Cecelia,* 963 F.2d 1467, 1475 (11th Cir.), *cert. denied,* 506 U.S. 964, 113 S.Ct. 436, 121 L.Ed.2d 356 (1992). Regarding Kent's discussion of Quinn's choice to obtain counsel, the government contends that Kent "simply advised Quinn of the consequences that could flow from delaying any attempt at cooperation." We observe, in any event, that Quinn made no inculpatory statements after Kent's statement about obtaining counsel.

---

[7] 295 months is roughly 24 and 1/2 years, with the likelihood of a reduction of 54 days per year for so-called good time.

We review the district court's factual findings for clear error and review its application of law to facts *de novo*. *United States v. Blackman,* 66 F.3d 1572, 1577 (11th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 1365, 134 L.Ed.2d 531, and *cert. denied,* --- U.S. ----, 117 S.Ct. 393, 136 L.Ed.2d 309 (1996). The district court adopted the report and recommendation of the magistrate judge, who concluded that Quinn's statement was voluntarily made, and, to the extent that Quinn's testimony conflicted with the finding that Agent Kent had made no threats to Quinn, it was not credible. The court also concluded that Quinn had been advised of his *Miranda* rights.

The admissibility of confessions is covered by 18 U.S.C. § 3501, which provides, in relevant part, that "[i]n any criminal prosecution brought by the United States ... a confession ... shall be admissible in evidence if it is voluntarily given." 18 U.S.C. § 3501(a). We agree with the district court that Quinn's statement was made knowingly and voluntarily. We also conclude that Quinn's suggestion that the statement should have been suppressed because he was not adequately advised of his *Miranda* rights is without merit. Quinn himself testified that an agent read him his rights. The district court did not err in denying the motion to suppress.

*F. Sentencing Guideline Issues*

Quinn further argues that the district court erred in determining that his offenses involved crack cocaine, that the court erred by rejecting his request for a downward departure, that the penalties for crack cocaine offenses are cruel and unusual as applied to Quinn, that the penalties for crack cocaine offenses lack a rational basis, and that the court erred by denying his request for discovery on his selective prosecution claim. All of these claims lack merit, and we address them briefly.

1. Quinn first contends that the district court erred in calculating his base offense level according to the guideline for 1.6 kilograms of crack rather than at the level which would be applicable to two kilograms of cocaine hydrochloride. He argues that there was insufficient evidence to justify sentencing him to the higher penalty for crack cocaine. We review *de novo* the district court's interpretation and application of the Sentencing Guidelines. *United States v. Lewis,*

13

115 F.3d 1531, 1536 (11th Cir.1997). We review the district court's factual findings for clear error. *Id.*

Here, because the jury's verdict did not specify the object of Quinn's conspiracy, *i.e.,* possession with intent to distribute cocaine hydrochloride or crack cocaine, Quinn could be sentenced under the guideline for crack cocaine only if "the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that offense." *United States v. McKinley,* 995 F.2d 1020, 1025-26 (11th Cir.1993) (quoting U.S.S.G. § 1B1.2(d) comment 5), *cert. denied,* 511 U.S. 1021, 114 S.Ct. 1405, 128 L.Ed.2d 77, and *cert. denied,* 511 U.S. 1036, 114 S.Ct. 1552, 128 L.Ed.2d 201 (1994). During the sentencing hearing, in response to Quinn's objection to the presentence report, the district judge stated:

> It's clear to me that if I were hearing this as the trier of fact, that I wouldn't have any trouble at all in finding that he was—the object of the conspiracy was to cook crack, so on that basis I would find that the evidence supports beyond a reasonable doubt that the purpose of the conspiracy was to cook crack with it.

The district court's explicit finding is amply supported by the record. The conversion of powder cocaine into crack not only was foreseeable by Quinn, but was plainly within the scope of the criminal activity that he undertook. There was evidence that Quinn had discussed "cooking" the cocaine with the informant, and that the elder Ruff, in Quinn's presence, had told the informant that he was in the business of making crack and needed high quality cocaine for that job. *Cf. United States v. Chisholm,* 73 F.3d 304, 308 (11th Cir.1996) (holding that it was neither reasonably foreseeable to defendant nor an object of the conspiracy that powder cocaine would be converted to crack where defendant merely assisted with the procurement of powder cocaine, had no contact with the crack dealer, and where the record contained no evidence that defendant had knowledge of, or agreement to, the planned conversion). Accordingly, we reject this argument.

2. Quinn next contends that the district court erroneously concluded that it lacked discretion to depart downward in order to reduce the disparity between his sentence and those of his codefendants. The codefendants, as mentioned above, had pled guilty and were sentenced under the guideline for cocaine hydrochloride, while Quinn was sentenced under the guideline for crack

14

cocaine. We review *de novo* Quinn's claim that the district court mistakenly believed that it lacked a basis for a downward departure. *United States v. Holden,* 61 F.3d 858, 860 (11th Cir.1995).

Quinn urges us to follow the Ninth Circuit's reasoning in *United States v. Kohl,* 972 F.2d 294 (9th Cir.1992), which held that a sentencing court may depart downward to adjust for disparities in the sentences of codefendants. In *United States v. Chotas,* 968 F.2d 1193 (11th Cir.1992), however, this court rejected that reasoning and held that a sentencing judge may not depart in order to avoid an apparently unjustified disparity between codefendants. *Id.* at 1197-98.

3. Quinn next challenges the constitutionality of the crack cocaine penalties. We review *de novo* a district court's conclusion that a sentencing statute is constitutional. *United States v. Byse,* 28 F.3d 1165, 1167 (11th Cir.1994), *cert. denied,* 513 U.S. 1097, 115 S.Ct. 767, 130 L.Ed.2d 663 (1995).

Quinn first contends that the crack cocaine penalties are cruel and unusual, in violation of the Eighth Amendment. This Circuit has rejected such a claim. *See United States v. Solomon,* 848 F.2d 156, 157 (11th Cir.1988). Quinn claims, nevertheless, that the penalties are cruel and unusual as they apply to him because of his lesser role in the transaction. A plurality of the Supreme Court, however, has rejected the notion that the Eighth Amendment's protection from cruel and unusual punishment extends to the type of offense for which a sentence is imposed; rather, it protects against cruel and unusual modes of punishment. *See Harmelin v. Michigan,* 501 U.S. 957, 965-66, 979-85, 111 S.Ct. 2680, 2686-87, 2693-96, 115 L.Ed.2d 836 (1991).

Quinn next contends that there is no rational basis for the enhanced crack cocaine penalties. This argument also is foreclosed by binding case law, as this Circuit has held repeatedly that a rational basis exists to support the differing penalties. *See, e.g., Byse,* 28 F.3d at 1170; *United States v. King,* 972 F.2d 1259, 1260 (11th Cir.1992).

4. Quinn filed a motion for discovery alleging that he had been selected for federal prosecution because he is black. The district court consolidated Quinn's motion with the motions of nine other movants, and after an evidentiary hearing, denied the motions. We review a trial

court's denial of a request for discovery relating to a selective prosecution claim for abuse of discretion. *See, e.g., United States v. Candia-Veleta,* 104 F.3d 243, 246 (9th Cir.1996); *United States v. Fares,* 978 F.2d 52, 59 (2d Cir.1992).

In *United States v. Armstrong,* --- U.S. ----, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), the Supreme Court held that the "rigorous standard for discovery" in aid of a selective prosecution claim "require[s] some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." *Id.* at ----, 116 S.Ct. at 1488 (internal quotation marks omitted). The threshold for showing "some evidence tending to show the existence" of the discriminatory effect element is "some evidence of differential treatment of similarly situated members of other races or protected classes." *Id.* at ---- - ----, 116 S.Ct. at 1488-89.

Quinn contends that he made this threshold showing because at least one black person was charged in federal court for a crime involving less than 50 grams of crack cocaine, while no white person has been so charged. The government contends that it does not prosecute cases involving less than 50 grams of crack cocaine (leaving them for local prosecution) unless there are additional circumstances, such as a prior record of drug offenses, or the involvement of a firearm in connection with the offense. Where such circumstances are absent for one offender, and present for another, the two persons are not similarly situated, and the government quite properly may treat them differently.

Here, the district court spent an entire day hearing testimony and argument on the selective prosecution discovery issue. At the conclusion of the hearing, the district court was satisfied that the United States Attorney's Office had made its prosecutorial decisions regarding crack cocaine offenses in a fair and unbiased manner and that state officers had not acted on any racial motives when they sought to refer cases for federal prosecution. The district court found that the defendants had failed to establish a colorable claim of discriminatory intent and that they thus were not entitled to obtain discovery from the government on the selective prosecution claim. We agree.

16

Accordingly, we conclude that the district court correctly denied Quinn's motion for discovery to support his selective prosecution claim.

*G. The Section 924(c)(1) Conviction*

Quinn challenges his conviction for using or carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). Quinn argues that the government failed to produce sufficient evidence to demonstrate that he was using or carrying a firearm during and in relation to a drug trafficking crime.

Sufficiency of the evidence is a question of law we review *de novo. United States v. Chirinos,* 112 F.3d 1089, 1095 (11th Cir.), *petition for cert. filed,* No. 97-5738 (U.S. Aug. 25, 1997). In determining whether sufficient evidence supports a defendant's conviction, we view the evidence in the light most favorable to the government and draw all reasonable inferences and credibility choices in favor of the jury's verdict. *Id.* To uphold the trial court's denial of the motion for a judgment of acquittal and the jury's guilty verdict, we need only find that a reasonable factfinder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt. *United States v. Range,* 94 F.3d 614, 616-617 (11th Cir.1996).

Section 924(c)(1) provides in relevant part:

> Whoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years, and if the firearm is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, to imprisonment for ten years....

18 U.S.C. § 924(c)(1). A defendant thus can be convicted under § 924(c)(1) upon a showing that he either used or carried a firearm. *Range,* 94 F.3d at 619. In order to sustain a conviction under the "use" prong of the statute, the government must show active employment of the firearm, such as firing, attempted firing, brandishing, displaying, bartering, or striking. *Bailey v. United States,* --- U.S. ----, ----, 116 S.Ct. 501, 508, 133 L.Ed.2d 472 (1995). To sustain a conviction under the alternative "carry" prong, the government must show an actual transporting of the firearm during and in relation to the drug trafficking offense, such as the defendant's having carried the firearm on

17

his person or in a vehicle used for drug distribution during and in relation to the drug trafficking offense. *See Chirinos,* 112 F.3d at 1095-96; *United States v. Farris,* 77 F.3d 391, 395 (11th Cir.), *cert. denied,* --- U.S. ----, 117 S.Ct. 241, 136 L.Ed.2d 170 (1996).

Here, the government presented evidence that a firearm was seized from a juvenile, who was apprehended holding the gun while sitting in Quinn's car. As Quinn points out, there is no evidence that Quinn personally brandished or displayed the gun. The gun was in his car, roughly 50-60 feet away from his person at the penultimate moment of the transaction.

There is, however, overwhelming evidence that Quinn carried a firearm during and in relation to a drug trafficking crime. In a post-arrest statement, Quinn said that the gun was his, that he had carried the gun to his car, that he had pulled off the highway while en route to the meeting place in order to check the gun, and that he had driven to the drug deal with the gun beside him for protection.[8]

In *Farris,* 77 F.3d at 391, we held that a gun in the glove compartment of a vehicle was "carried" in violation of § 924(c)(1) when the vehicle was being used as a base for drug distribution. *Id.* at 395. In that case, however, the cocaine had been transported to the scene in the vehicle along with the gun. Defendant thus contends that *Farris* is inapplicable because Quinn's vehicle was used only to get Quinn to the scene of the transaction, and was not used to transport the cocaine. In *Chirinos,* however, this court held that the reasoning in *Farris* applied where a defendant had driven to an airstrip in order to steal a shipment of cocaine, and where agents had seized a mini-assault rifle from the back seat of the vehicle, even though there was no cocaine in the vehicle. *See Chirinos,* 112 F.3d at 1095-96; *see also Range,* 94 F.3d at 617 (holding that a defendant carried a gun where the gun was stored under the floormat of his vehicle during a delivery of money for cocaine).

Quinn also contends that a firearm is not "carried" in violation of § 924(c)(1) where, as here, it is not available for immediate use because it was 50-60 feet away from him at the end of the

---

[8]We observe that this evidence also supports Quinn's conviction for carrying the gun during and in relation to the cocaine conspiracy.

scenario. Other circuits are split on the issue whether a firearm must be immediately accessible to a defendant in order to support a "carrying" conviction under § 924(c)(1). The First, Fourth, Seventh, and Tenth Circuits have held that a gun may be "carried" in a vehicle for the purposes of § 924(c)(1) without necessarily being immediately accessible to the defendant. *See United States v. Cleveland,* 106 F.3d 1056, 1066-1068 (1st Cir.1997) ("the ordinary meaning of the term "carry' ... affords no basis for imposing an accessibility requirement"), *petition for cert. filed,* No. 96-8837 (Apr. 30, 1997); *United States v. Mitchell,* 104 F.3d 649, 653-54 (4th Cir.1997) ("the firearm does not cease to be "carried' simply because it is not readily accessible to the offender"); *United States v. Molina,* 102 F.3d 928, 932 (7th Cir.1996) ("a gun does not have to be within a defendant's immediate reach" to satisfy the "carry" prong); *United States v. Miller,* 84 F.3d 1244, 1259 (10th Cir.) ("the government can obtain a conviction under the "carry' prong even without proof [that] the firearm was in effortless reach"), *cert. denied,* --- U.S. ----, 117 S.Ct. 443, 136 L.Ed.2d 339 (1996), *overruled on other grounds by United States v. Holland,* 116 F.3d 1353 (10th Cir.1997). The Second, Sixth, and Ninth Circuits, in contrast, have imposed the requirement of immediate accessibility. *See United States v. Giraldo,* 80 F.3d 667, 676-77 (2d Cir.1996) ("a person cannot be said to "carry' a firearm without at least a showing that the gun is within reach during the commission of the drug offense" (internal citation omitted)), *cert. denied,* --- U.S. ----, 117 S.Ct. 135, 136 L.Ed.2d 83 (1996); *United States v. Hernandez,* 80 F.3d 1253, 1258 (9th Cir.1996) ("the firearm must have been immediately available for use by the defendant"); *United States v. Riascos-Suarez,* 73 F.3d 616, 623 (6th Cir.) ("the firearm must be immediately available for use—on the defendant, or within his or her reach"), *cert. denied,* --- U.S. ----, 117 S.Ct. 136, 136 L.Ed.2d 84 (1996).

In *Farris,* this Circuit implicitly rejected the requirement of immediate availability. In that case, the defendant was apprehended as he approached a motel room with a quantity of cocaine; his gun was found in the glove compartment of a vehicle parked in the motel parking lot. *See Farris,*

19

77 F.3d at 393-94. For all of these reasons, we find the evidence sufficient to support Quinn's conviction under § 924(c)(1).[9]

*H. The Section 924(c)(1) Jury Instruction*

Quinn asserts that he is entitled to a new trial on the § 924(c)(1) issue because the jury instruction on that issue was incorrect in light of the Supreme Court's subsequent *Bailey* decision.

The district court instructed the jury:

> The mere presence of a firearm or firearms at the scene of a transaction or event does not necessarily establish proof that the firearm was being used or carried in relation to a drug trafficking offense. Possession of a firearm constitutes use in relation to a drug trafficking offense if the possession is an integral part of and facilitates the commission of the drug trafficking offense.

> Using or carrying a firearm during and in relation to a drug trafficking offense can be established by showing: One, proof of a transaction in which the circumstances surrounding the presence of a firearm suggest that the possessor of the firearm intended to have it available for possible use during the drug trafficking transaction, or two, the circumstances suggest that a firearm was strategically located so as to be quickly available for use during a drug trafficking transaction.

The parties agree that this instruction was erroneous vis-a-vis the "use" prong of § 924(c)(1), in light of the Supreme Court's holding in *Bailey* that possession of a firearm without active employment of that firearm cannot sustain a conviction under the "use" prong of the statute. *See Bailey,* --- U.S. at ---- - ----, 116 S.Ct. at 508-09. An erroneous jury charge entitles a defendant to reversal of his conviction and remand for a new trial on the count in question only when a reasonable likelihood exists that "the jury applied the instruction in an improper manner." *Chirinos,* 112 F.3d at 1096 (internal citation marks omitted); *see also Range,* 94 F.3d at 619-20 (a general verdict under § 924(c)(1) will be sustained so long as the evidence is sufficient to establish one of the means of violating it, but the reviewing court must be able to determine with absolute certainty that the jury based its verdict on the ground on which it had been properly instructed); *United States v. Rogers,* 94 F.3d 1519 (11th Cir.1996) (applying harmless error analysis to jury charge error of constitutional dimensions when error did not play any role in the verdict), *cert. granted in part,* ---

---

[9]We also note, although it is not of dispositive significance, that the gun was immediately available to Quinn at every stage until he got out of the car.

U.S. ----, 117 S.Ct. 1841, 137 L.Ed.2d 1046 (1997); *United States v. Holland,* 116 F.3d 1353, 1359 n. 4 (10th Cir.1997) ("essential inquiry" is whether the jury's verdict, in light of instructions given and evidence, is the "functional equivalent" of required findings for a "carry" conviction, citing *United States v. Windom,* 103 F.3d 523, 524 (7th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 1716, 137 L.Ed.2d 839 (1997); *United States v. Pimentel,* 83 F.3d 55, 60 (2d Cir.1996); *United States v. Moore,* 76 F.3d 111, 112 (6th Cir.1996), *petition for cert. filed,* No. 97-5648 (Aug. 18, 1997)).

We are convinced that the jury found Quinn guilty of "carrying," and not of "using," the firearm. In reaching this conclusion, we note that the evidence of the "carrying" of the firearm was overwhelming, and that there was a complete lack of evidence from which the jury could have concluded that Quinn "used" the gun—even under the instruction given by the district court. *See Range,* 94 F.3d at 620. The trial judge instructed the jury that mere possession of a firearm during a drug trafficking offense is insufficient to establish "use," and that to find that Quinn "used" or "carried" the firearm, the jury would have to find that it was "available for possible use during the drug trafficking transaction, or ... strategically located so as to be quickly available." Here, where the gun was 50-60 feet away, it was at that moment in time neither "available" nor, relatively speaking, "quickly available." We thus conclude that a properly instructed jury would have found Quinn guilty of violating § 924(c)(1) on the basis of the "carrying" prong of the statute, evaluated in light of the evidence adduced.

### III. Conclusion

For the foregoing reasons, the convictions and sentence are AFFIRMED.