[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 00-14694

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 21, 2002
THOMAS K. KAHN
CLERK

D. C. No. 99-00098-CR-BU-S

UNITED STATES OF AMERICA,

Plaintiff-Appellee,
Cross-Appellant,

versus

HARRY W. SNYDER, JR., RENEE PEUGEOT,

Defendants-Appellants,
Cross-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Alabama

_____

**(May 21, 2002)**

Before EDMONDSON, HILL and LAY[*], Circuit Judges.

LAY, Circuit Judge:

---

[*]Honorable Donald P. Lay, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

Dr. Harry W. Snyder, Jr., Ph.D., and his wife, Renee Peugeot, appeal their convictions and the sentences imposed after they were found guilty of mail fraud, making false statements to the Food and Drug Administration, and conspiring to commit offenses against the United States. Snyder was employed as a Vice-President of Clinical Development at BioCryst Pharmaceuticals, Inc., a small, publicly-traded pharmaceutical company concerned with the development of synthetic drugs. Specifically, BioCryst was involved in the development of BCX-34 for the treatment of psoriasis and cutaneous T-cell lymphoma (CTCL), a relatively rare and potentially fatal form of skin cancer. Peugeot was employed as the Study Coordinator and Sub-Investigator for Dr. W. Mitchell Sams, the principal Investigator of the BCX-34 clinical studies at the University of Alabama at Birmingham. Snyder and Peugeot's indictments and convictions stem from their participation in a scheme to falsify and misrepresent data from the clinical studies in order to show the drug's effectiveness at treating CTCL. Due to Snyder's stock options, defendants had a substantial personal interest in BioCryst. After the false BCX-34 results were announced, BioCryst stock rose to as much as $13.75 per share. The stock fell dramatically after the fraud was announced.

Trial and Conviction

2

Defendants first contend certain comments made by the trial judge to the jury through the course of the trial denied them a fair trial by distracting the jury from the legal principles they were to apply in deciding guilt or innocence. Many of the comments referenced by the defendants are clearly innocuous. For instance, the judge's inquiry as to the medicinal effects of vitamin C–for the purpose of emphasizing the importance of staying healthy after two alternate jurors had been dismissed–is certainly not improper. Even the potentially problematic comments following the judge's charge to the jury[1] cannot be considered "so prejudicial as to amount to the denial of a fair trial." United States v. Ramos, 933 F.2d 968, 973 (11th Cir. 1991). The trial judge's comments clearly do not warrant reversal.

Defendants also argue for reversal based upon a question by the prosecutor concerning Snyder's indictment. To prevail on a claim of prosecutorial misconduct, a defendant must not only show improper comments by the prosecutor, but also show those comments prejudicially affected the substantial rights of the defendant. United States v. Castro, 89 F.3d 1443, 1450 (11th Cir. 1996). The district court's denial of defendants' motion for mistrial is reviewed for abuse of discretion. United States v. Perez, 30 F.3d 1407, 1410 (11th Cir. 1994). The comment complained of came on

---

[1]The trial judge followed his charge to the jury with, as described by the defendants, "a dramatic and misty-eyed soliloquy about the movie 'Saving Private Ryan,' the judge's father's World War II experience, 'our system of justice,' and the special robe given him by Judge Seybourn Lynne."

redirect examination by the prosecutor after the defense attorney asked a witness whether misconduct would nullify the severance agreement as it related to Snyder's stock options. The prosecutor then asked whether an indictment would have been considered a form of misconduct, precluding Snyder's entitlement to the stock options. The trial judge sustained defense counsel's objection and instructed the jury to ignore the question. Out of the presence of the jury, the trial judge explained it was unnecessary to give an additional curative instruction because the issue–that an indictment is not evidence of guilt–had been covered "no less than four times" previously. Furthermore, there is no evidence the jury misunderstood the earlier instructions, nor is there a reasonable probability that "but for the offending remarks, the defendant would not have been convicted." United States v. Calderon, 127 F.3d 1314, 1335 (11th Cir. 1997) (quoting United States v. Rodgers, 981 F.2d 497, 499 (11th Cir. 1993)). We fail to see any prejudice resulting from the alleged improper comment and hold the trial court's denial of defendants' motion for a mistrial was not an abuse of discretion.[2]

### Sentencing Guidelines

---

[2]Defendants also argue the prosecution failed to prove Peugeot guilty beyond a reasonable doubt. After considering all the evidence presented in the case, including evidence put on by the defendants, see United States v. Brown, 53 F.3d 312, 314 n.3 (11th Cir. 1995), we hold "a reasonable fact finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt." United States v. Quinn, 123 F.3d 1415, 1426 (11th Cir. 1997).

4

Initially, defendants claim the trial court erred in awarding a two-level enhancement for knowingly endangering the clinical-trial volunteers.[3] Defendants argue the trial court failed to make explicit findings respecting the enhancement and the government failed to prove their behavior created a risk of serious bodily injury. See U.S. Sentencing Guidelines Manual § 2F1.1(b)(6)(A) (1998).[4] The Guidelines, however, do not require that the victim actually suffer serious bodily injury. Rather, the question is whether the defendant placed the victim at such a risk. CTCL is a rare and potentially fatal form of cancer. Treatment is essential in slowing the disease's progress to later, and more deadly, stages. Volunteers testing the CTCL treatments at issue here were required to forego other treatments. Two patients testified they volunteered for the second, six-month study based upon the falsified results of the first, six-week study. CTCL meets the definition of serious bodily injury, and

---

[3]Defendants also argue that, as a result of the Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000), the U.S. Sentencing Guidelines are unconstitutional. That argument is foreclosed by this court's ruling in United States v. Nealy, 232 F.3d 825, 829 n.3 (11th Cir. 2000), as well as by the Apprendi decision itself. See 530 U.S. at 496 n.21.

[4]This subsection has since been deleted from the Guidelines and consolidated into § 2B1.1. See Thomas W. Hutchison, Highlights of the 2001 Amendments, Federal Sentencing Guidelines Manual, XXV (West 2001 ed.); U.S. Sentencing Guidelines Manual § 2B1.1(b) (2001). The Guidelines, however, instruct the sentencing court to "use the Guidelines Manual in effect on the date the defendant is sentenced." U.S. Sentencing Guidelines Manual § 1B1.11. Thus, all textual references to the Guidelines will be to the 1998 edition, which was in effect at the time of the defendants' sentencing on August 30-31, 2000.

defendants' conduct qualifies as creating a conscious or reckless risk of such injury. Thus, we hold application of the two-level enhancement was not erroneous.

The final issue presented concerns the appropriate measure of the victims' loss under Sentencing Guideline § 2F1.1(b)(1). Prior to sentencing, the government obtained an estimated victim loss calculation from an accounting report prepared by Dr. Russell M. Barefield, CPA, Ph.D., at the direction of the U.S. Attorney's Office. Barefield's calculations were based on the amount BioCryst stockholders were deemed to have lost due to defendants' fraud. Barefield concluded the amount of the victims' loss was approximately $34.4 million. Pursuant to the Sentencing Guidelines, this would require enhancing the base level of six (for crimes involving fraud and deceit) by sixteen levels. U.S. Sentencing Guidelines Manual § 2F1.1(b)(1)(Q). The trial court, however, found a reasonable estimate of the victims' loss was not feasible:

> To ascertain whom the individual investors were that suffered financial losses would be exhaustive; indeed highly improbable. It would require significant expenditures of time and resources to determine the large amount of detailed information and no such information is before this Court.

Transcript of Sentencing Hearing at 152-53. The court then found, *sua sponte*, the better calculation of the victims' loss would be to use the intended or potential gain attributable to the defendants. Using this method, the court concluded the amount of

6

loss attributable to defendants was between $200,000 and $350,000. Thus, the court awarded an eight-level increase pursuant to Sentencing Guideline § 2F1.1(b)(1)(I). Defendants argue the trial court erred in calculating the amount of their gain. The government concedes the court erred, but contends the error was the choice of methodology rather than the calculation. In its cross-appeal, the government argues the court should have enhanced the defendants' sentences based upon the actual loss incurred by the BioCryst stockholders.

We review the application and interpretation of the Sentencing Guidelines de novo, and we review findings of fact for clear error. United States v. Harness, 180 F.3d 1232, 1234 (11th Cir. 1999). When calculating the monetary value of the victims' loss under Sentencing Guideline § 2F1.1(b)(1), substitution of defendants' gain is not the preferred method because it ordinarily underestimates the loss. U.S. Sentencing Guidelines Manual § 2F1.1 cmt. n.9; United States v. Orton, 73 F.3d 331, 334 (11th Cir. 1996). Where precise figures are not ascertainable, it is preferable to calculate the victims' loss by determining "the approximate number of victims and an estimate of the average loss to each victim . . . ." U.S. Sentencing Guidelines Manual § 2F1.1 cmt. n.9.

In the present case, the trial court erred when it found calculating the loss to victims was not feasible. "All that is required is that the court 'make a reasonable

7

estimate of the loss, *given the available information.'"* Orton, 75 F.3d at 335 (quoting

U.S. Sentencing Guidelines Manual § 2F1.1 cmt. n.9). The court was correct, though,

in resisting Dr. Barefield's ultimate conclusions. While presenting a thorough

analysis, Dr. Barefield uses the number of outstanding shares as a proxy for the

number of victims. This overestimates the actual loss because, unlike the

circumstances presented in United States v. Hedges, 175 F.3d 1312, 1314 n.6 (11th

Cir. 1999), the stock here was not totally worthless after the conspiracy was

discovered. Thus, not every shareholder suffered a loss. We understand the trial court

was attempting to follow our decision in Orton, where this court held the "loss to

losing victim" approach is not required in every case. Orton, 73 F.3d at 334. Just

because each individual's precise loss cannot be ascertained does not mean that the

district court should abandon a loss calculation altogether. Dr. Barefield's research

suggests a reasonable estimate of the victims' loss based on existing information is

feasible. Therefore, the trial court will need to recalculate the monetary loss under

Sentencing Guideline § 2F1.1(b) by estimating the loss caused by defendants' fraud.[5]

Defendants claim there is no actual loss to the innocent (i.e., non-insider)

---

[5]Since we do not hold the "gain to defendant" method is the appropriate calculation of loss in the present case, we have no occasion to visit the question of whether a logical relationship between a victim's loss and defendant's gain is required. See e.g., United States v. Yeaman, 194 F.3d 442, 456 (3d Cir. 1999) (requiring such a "logical relationship" before permitting defendant's gain to be used as a surrogate for loss to the victim).

BioCryst stockholders because the price of BioCryst stock was higher after disclosure of the fraud than its average price during the life of the fraud. While this method of valuing loss–subtracting the stock price after the fraud from the average stock price over the life of the fraud–may be appropriate in many cases involving securities fraud, it is certainly not the only method available to the court. Keeping in mind the need to achieve only a "reasonable estimate" of the loss to the victims, the court may need employ a slightly different, but nonetheless proper, methodology. For instance, it may be most effective to focus on the period between the May 31, 1995, press release announcing BCX-34 was "effective" in treating CTCL and the days immediately following the announcement of the fraud on June 16, 1995.[6] It is fair to say that, as a result of the fraud, a large number of individuals and institutions were induced to purchase BioCryst stock at an artificially inflated price. Their losses are substantially undervalued by utilizing the "gain to defendants" approach.

---

[6]After the May 31, 1995 press release, BioCryst stock jumped from around $6.25 to $8.25 a share. The stock peaked at approximately $13.75 a share and averaged $9.63 a share in exceptionally heavy trading between May 31 and June 16, 1995. After the June 16, 1995 announcement, the stock dropped as much as $6.00 a share, averaging $8.13 a share the three days following the announcement and $8.67 a share through the week. Assuming, based on daily trading data, between 500,000 and 775,000 innocent shares at an average loss of $1.50 ($9.63-$8.13 = $1.50), loss to the victims would be between $750,000 and $1,162,500. Although a conservative estimate, this represents an additional two-level increase in defendants' sentences pursuant to U.S. Sentencing Guideline § 2F1.1(b)(2), and underscores the level to which the gain to defendants' approach underestimates the victims' loss.

9

Accordingly, on the issue of calculating loss under Sentencing Guideline § 2F1.1(b), we REVERSE and REMAND for further proceedings consistent with this opinion. We AFFIRM the district court's rulings with respect to all other issues raised.

HILL, Circuit Judge, concurring:

I concur in the panel opinion and add one further thought. The type of crime committed here tends to provide a relatively small and certain amount of expected gain to defendants and a far larger and less certain loss to innocent investors throughout the market. Here the perpetrators seek something of value for themselves with reckless disregard for their faceless victims. The extent of their wrongdoing will usually greatly exceed what they hoped to derive from their nefarious conduct.

The district court, looking at the defendants' expected gain, concluded that for sentencing purposes, the amount of loss attributable to the defendants was between $200,000 and $350,000. The government's expert concludes that the loss impact upon investors was $34.4 million! The great difference in the two figures describes and defines the callousness of defendants who, in order to obtain relatively little, acted in utter disregard of the vast financial loss consequence they inflicted on so many. It is not appropriate therefore to limit sentencing consequences to defendants' gain,

10

thereby ignoring victims' loss. *See* U.S. Sentencing Guidelines Manual § 2F1.1, cmt. n.9.

Of course, the estimated loss must not be based upon pure guesswork or speculation. If however, there is a good basis for a reasonable estimate, the sentencing court should tend to overlook fine-tuned objections demanding precise dollar and cent calculations of loss. *Id.* The opinion prepared for us by Judge Lay provides adequate direction to the district court empowering it to calculate the consequential loss to victims with reasonable certainty.