[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 20, 2012
JOHN LEY
CLERK

_____

No. 08-17263 & 09-16093

_____

D.C. Docket No. 08-60014-CR-DMM

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JOHN VINCENT ARTUSO,
GREGORY ORR,
VINCENT F. ARTUSO,
a.k.a Vinnie,
PHILIP EDWARD FORGIONE,
a.k.a. Fip,
a.k.a. Flip,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(June 20, 2012)

Before EDMONDSON and PRYOR, Circuit Judges, and BOWDRE,[*] District Judge.

PER CURIAM:

Vincent F. Artuso, John Vincent Artuso, Gregory Orr, and Philip Edward Forgione appeal their convictions for conspiracy under the Racketeer Influenced Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1961-68), multiple mail and wire fraud counts, and money laundering conspiracy; in addition, the Artusos and Orr appeal their convictions of fourteen counts of substantive money laundering of which Forgione was found not guilty. Orr and Forgione also appeal the denial of their post-trial motions for a new trial based on newly discovered evidence.

While the Court has considered all issues raised by the Artusos, Orr and Forgione, we find no merit in any of them and only discuss four issues: (1) the sufficiency of the evidence to support the mail and wire fraud convictions; (2) the sufficiency of the evidence to support the RICO conspiracy convictions; (3) the district court's failure *sua sponte* to remove a potential juror from the panel; and (4) the district court's allowing the government to ask Forgione whether he had

---

[*] Honorable Karon O. Bowdre, United States District Judge for the Northern District of Alabama, sitting by designation.

been previously accused of being a member of organized crime. After careful consideration of the record, review of the trial transcript and the parties' briefs, and with the assistance of oral argument, we find no reversible error and affirm.

## I.  BACKGROUND

> The wish to acquire more is admittedly a very natural
> and common thing; and when men succeed in this they
> are always praised rather than condemned. But when
> they lack the ability to do so and yet want to acquire
> more at all costs, they deserve condemnation for their
> mistakes. ~ Niccolo Machiavelli

This case demonstrates the truth of Machiavelli's observation. Like so many white collar crimes, the genesis of this case rests in greed—the desire to acquire more at all costs. That desire led Larry Horton not only into a scheme to defraud his employer, but also into a conspiracy with members of organized crime.

In the spring of 2001, Horton, as vice-president of implementation and planning at ADT,[1] saw an opportunity to profit personally from his cash-strapped employer's need to liquidate excess properties acquired in a merger with

---

[1] After Tyco International, Ltd. acquired ADT Services, Inc. in 1997, ADT continued to do business as "ADT," and Larry Horton became a vice president of operations for ADT. The names "Tyco" and "ADT" were used interchangeably at trial because ADT remained its own entity after the takeover by Tyco.

SecurityLink. ADT sold some of the properties with a "leaseback" arrangement that allowed it to remain as a tenant. When his superiors decided which properties to sell, Horton took charge of the marketing and negotiations of the sales, subject to limited oversight. Horton's greed drove him to develop a scheme to take advantage of the situation.

To hide his own involvement, Horton sought a partner who would work with him to buy these properties below market rates and lease them back to ADT at above market rates, making a substantial profit for themselves in the process. Horton found a willing partner in his neighbor Gregory Orr. This sale-and-leaseback activity forms the basis of the illegal scheme to defraud ADT that is central to the indictment. Orr in turn recruited members of the South Florida crew into the conspiracy with Horton.

Horton, who pled guilty and cooperated with the prosecution, testified that he and Orr agreed on a set of sales and lease prices for the initial three properties they decided to purchase, based to some extent on property appraisals used during the merger with SecurityLink in which ADT had recently acquired the properties. Those appraisals, however, did not include the increased value that the leaseback agreements would add. To give an appearance of legitimacy to their deals, Orr entered into a series of false offers and counter-offers with Horton through ADT's

4

in-house counsel until they reached their pre-arranged prices. In the fall of 2001, after concluding the sham negotiations, Horton executed three separate sale-leaseback contracts for ADT properties, at below their appraised values, with corporate entities controlled by the defendants.

After the purchase agreements were executed on these three properties, Orr revealed to Horton that he had brought additional partners into the scheme because he did not have sufficient capital on his own to secure financing for the deals. Those partners included Vincent Artuso; his son John Artuso; Philip Forgione; Robert Gannon, who was acquitted; and Thomas Rossi, who was not indicted, but who testified at trial. When Horton expressed surprise about the new partners and asked what the Artusos knew about the transactions, Orr responded, "Everything." Each new partner played a distinct role. The Artusos recruited Forgione, who in turn recruited Rossi to secure financing through his connections at GE Financial.

Rossi eventually obtained financing for the first three properties. Once financing was secured, to obtain his supervisor's approval, Horton presented a spreadsheet listing the offers and the SecurityLink appraised values, or a lower appraised value, on the three properties. Horton did not disclose that the sales prices—all below the fee-simple market value— included leaseback arrangements that increased their value. Within hours, Horton received approval without any

5

questions. The closing on these three properties occurred in February 2002.

In July 2002, Horton arranged the purchase of a fourth property through similar tactics. The sale closed in September 2003. However, Rossi and Forgione were completely excluded from this deal.

Monthly payments for the ADT leases were mailed to the various companies created to purchase the properties; the funds were then distributed to the lenders and to the myriad of corporations owned by the various defendants according to their percentage of interests. In total, Orr collected at least $648,958; John Artuso collected at least $638,472; Vincent Artuso collected at least $306,182; Forgione collected at least $224,982; and Horton collected more than one million dollars.

The greedy scheme began unraveling in January of 2006 when FBI agents paid Horton a visit. He denied any professional dealings with Orr, his companies, or representatives. Upset by the visit, Horton then met with Orr. For the first time, Horton learned of Vincent Artuso's past when Orr suggested that the FBI was interested in Artuso only because of his ties to organized crime. During the pendency of the FBI investigation, Vincent Artuso and Orr made veiled threats that intimidated Horton and prevented him from cooperating with law enforcement. ADT terminated Horton's employment in the spring of 2006. The indictment followed in 2008. Horton's life in the fast lane came to an abrupt halt.

6

Before the trial, he agreed to plead guilty and testify against the other defendants.

## II. DISCUSSION

A.  Sufficiency of the Evidence to Support Fraud Convictions

Orr and the Artusos challenge the sufficiency of the evidence to support their convictions on the fraud counts.  To uphold convictions for mail and wire fraud requires sufficient evidence of intentional participation in a scheme to defraud and use of the interstate mail and wires in furtherance of the scheme. *United States v. Hasson*, 333 F.3d 1264, 1270–71 (11th Cir. 2003).  To establish a scheme to defraud requires proof of a material misrepresentation or the omission or concealment of a material fact calculated to deceive another of money or property.  *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (citing *Hasson,* 333 F.3d at 1270–71).  "A misrepresentation is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision maker to whom it is addressed.'"  *Maxwell*, 579 F.3d at 1299 (alteration in original) (quoting *Hasson*, 333 F.3d at 1271).  Direct proof of willful intent to defraud rarely

surfaces, so the government may prove it by inferences raised from the activities of the parties. *See United States v. Munoz*, 430 F.3d 1357, 1369 (11th Cir. 2005) ("Direct proof of willful intent to defraud is not necessary. It may be inferred from the activities of the parties involved.") (quoting *Blachly v. United States*, 380 F.2d 665, 676 (5th Cir. 1976)).

The standard of review for a sufficiency of the evidence challenge is *de novo*; however, we review the evidence in the light most favorable to the government, with all reasonable inferences and credibility determinations made in its favor. *See United States v. Diaz*, 248 F.3d 1065, 1084 (11th Cir. 2001). The evidence passes the sufficiency test if any reasonable trier of fact could find guilt beyond a reasonable doubt. *United States v. McDowell*, 250 F.3d 1354, 1364–65 (11th Cir. 2001). We find that the government presented sufficient evidence of fraud from which a reasonable jury could find these defendants guilty of the various counts of mail and wire fraud that they challenge here.

Although the defendants do not contest their use of the mails and wires, they do challenge the sufficiency of the evidence as to the scheme to defraud ADT of money or property. Orr and the Artusos argue that the government's case essentially was one of honest services fraud, which was not charged in the indictment, and that Horton's breach of his ethical duty to his employer was not a

8

criminal fraud.

Their argument ignores the fact that the government pled and proved more than just a scheme to conceal from ADT Horton's involvement in the sale-and-leaseback scheme. The Superseding Indictment set forth in detail that the defendants conspired to engage in real estate transactions with ADT through Horton in which specific properties were sold to the defendants substantially below market value and leased back to ADT for payments substantially above fair market value.

Further, the government pled and proved that Horton and Orr devised an intricate scheme to defraud ADT and enrich themselves and the other defendants. Horton and Orr engaged in sham negotiations for the purchase and leaseback of four properties that ADT had acquired during its acquisition of SecurityLink. The prices they agreed to pay for each property were below the fee-simple property appraisals prepared during that acquisition; they also knew that a purchase that included a leaseback would increase the fair market value. To receive approval for these sales, Horton prepared a spreadsheet that reflected a market value even *lower* than the ones from the SecurityLink fee-simple appraisals and closer to their pre-agreed sales prices. The spreadsheet did not mention that the transactions were sale-and-leaseback agreements and not simple sales.

9

As one example, the sales price to the defendants for the Pompano Beach, Florida property was $1,290,000. The spreadsheet Horton sent to the CFO reflected a market value of $1,410,000, while the SecurityLink fee-simple appraisal reflected a value of $1,570,000. Although unknown to the defendants at the time of the transactions, the eventual lender, GE Capital, obtained an appraisal reflecting a lease-fee market value of $3,770,000 for the property. Horton also agreed to a rental rate of $16.13 per square foot for the Pompano Beach property when the SecurityLink appraisal set its market rental rate at $7.00 per square foot. The three other transactions followed a similar pattern.

These misrepresentations go far beyond an employee's mere ethical violation of his fiduciary duty to his employer. Taken in the light most favorable to the government, the evidence sufficiently established that Horton and Orr agreed to participate in a scheme to defraud ADT of millions of dollars; they used Horton's insider position to buy properties at prices substantially below market value while misrepresenting those market values to ADT, and lease them back to ADT at rates substantially above market rates, all the while concealing Horton's role on both sides of the transactions.

Orr seems to present a "no harm/no foul" argument that the government failed to prove ADT was defrauded of any money or property and, therefore, the

10

evidence failed to support the convictions. He emphasizes that ADT was desperate to sell the properties because it needed cash and that it sold other properties below market value. His argument misses the point of mail and wire fraud criminal charges.

The mail and wire fraud statutes do not focus on the victim's actual loss but on the defendant's intent to obtain money or property by means of fraud or deceit. As this Court has noted, "financial loss is not at the core" of the mail and wire fraud statues; "[i]nstead, the penal statutes also seek to punish the intent to obtain money or property from a victim by means of fraud and deceit." *Maxwell*, 579 F.3d at 1302. The formulation and implementation of a scheme to defraud support a prosecutable offense regardless of its ultimate success or actual impact on the victim. *See United States v. Suba*, 132 F.3d 662, 673 (11th Cir. 1998) (explaining that prosecutable mail fraud does not depend on the success of the scheme); *United States v. Ross*, 131 F.3d 970, 986 (11th Cir. 1997).

After oral argument, Orr notified the Court of supplemental authority for his contention that the government failed to allege or prove that ADT was defrauded; he cites *United States v. Lander*, 668 F.3d 1289 (11th Cir. 2012). In *Lander*, the Court reversed a mail fraud conviction and its related money laundering counts because the material representation alleged in the indictment was specifically

11

disproved at trial, and the government shifted its trial strategy to suggest a different misrepresentation. In doing so, the Court recognized that an allegation of a variance between the indictment and proof at trial presents "'one form of challenge to the sufficiency of the evidence.' *United States v. Jenkinson*, 779 F.2d 606, 616 (11th Cir. 1986). 'A "variance" occurs when the evidence at trial establishes facts materially different from those alleged in the indictment.' *United States v. Caporale*, 806 F.2d 1487, 1499 (11th Cir. 1986)." *Lander,* 668 F.3d at 1295.

The *Lander* case does not help Orr's cause. Unlike the situation in *Lander*, the indictment in this case specifically identified the precise scheme to defraud and the false representations as to the material facts of the market values that affected the sales price and lease values, and the concealment of Horton's involvement in the deceptive transactions. The evidence at trial proved that scheme. Therefore, unlike *Lander*, Orr and the other defendants here, in fact, were informed of the charges against them so that they were not surprised at trial by the evidence the government offered. *Cf. Lander*, 668 F.3d at 1296 (citing *Thompson v. Nagle*, 118 F.3d 1442, 1453 (11th Cir. 1997) ("[T]he rationale behind the material variance rule is that the accused be informed of the charges against him and that he not be surprised by the evidence offered at trial.")).

12

The evidence presented at trial, viewed in the light most favorable to the government, sufficiently demonstrates the defendants' intent to defraud and, therefore, supports the jury's verdict on the mail and wire fraud counts.

B.      Sufficiency of the Evidence to Support RICO Conviction

The defendants focus their challenge to their RICO convictions on the sufficiency of the evidence as to the existence of the charged enterprise—the South Florida crew. John Artuso and Forgione, in briefs adopted by the other defendants, argue that the government failed to prove the existence of a South Florida crew of the Gambino family—a critical element of the RICO conspiracy as charged in the Superseding Indictment—or their involvement with it. They correctly note that, having amended the Indictment to specify the RICO enterprise as the South Florida crew of the Gambino family, the government bore the burden of proving that the defendants participated directly or indirectly in the specific enterprise's activities through a pattern of racketeering activity. *See* 18 U.S.C. § 1962(c); *United States v. Weissman*, 899 F.2d 1111, 1115 (11th Cir. 1990). Contrary to the defendants' argument, however, we find the evidence sufficient for the jury to have found both the existence of the South Florida crew and each

13

defendant's participation with it.

Much of the government's evidence to support its RICO allegation of ties to the Gambino crime family came from Lewis Kasmann, a close friend of the infamous John Gotti and an on-again-off-again FBI informant since 1996. Kasmann moved to Florida sometime around 2003 or 2004. A Gambino captain gave him a list of names to contact if he needed anything; that list included the name of Vincent Artuso. Later, another known Gambino member introduced Kasmann to Vincent Artuso, who said he had "a lot of good things going on down here . . . I am the guy down here." Kasmann testified that he understood the statement to mean that Vincent Artuso was the captain of the South Florida crew.

Sometime between 2004 and 2005, Vincent Artuso encouraged Kasmann to meet with Orr. When they did meet, Orr laid out the details of the ADT/Tyco sale-and-leaseback scheme, including the involvement of an insider, and offered Kasmann a cut if Kasmann helped with refinancing. Kasmann advised Vincent Artuso that doing business directly with him would violate Gambino protocol unless they advised central administration. Kasmann also expressed concerns because the insider was a family "outsider" who might "flip" (i.e. testify for the government).

In 2006, after Kasmann began cooperating with the FBI, he recorded several

14

conversations with people in the Gambino administration. He recorded a conversation with consigliere[2] "Joe Joe" Corozzo in which Kasmann described the "Tyco deal." Corozzo did not know about it. Kasmann also talked with Peter Gotti, the Gambino boss, who mused that perhaps Vincent Artuso should be demoted.

In addition, the government presented statements from co-conspirators to support the defendants' connection to organized crime. In January 2006, the FBI approached Horton about his business deals with Orr and the Artusos, and he first denied any involvement. Horton then met with Orr. Horton later testified that Orr told him that Vincent Artuso had ties to organized crime and that John Artuso "had a past." Orr told Horton that he was close friends with the Artusos despite Vincent's involvement with organized crime. Orr explained that he had known Vincent from their neighborhood in New York and that "you needed to know" someone like Vincent Artuso to do business.

Donald Race, whom Forgione had recruited to assist with financing but who was not indicted, testified that Forgione told him that he was a member of "the mafia, organized crime" at the same level as Vincent Artuso, but in a "different

---

[2] As explained by FBI Special Agent for organized crimes, "the consigliere is a buffer, acts as a buffer between the skippers – the captains and the boss. So if the skippers have a problem or a beef, they go to the consigliere who resolves it."

family." Race testified about attending over a dozen meetings with Orr and John Artuso regarding the ADT/Tyco properties and that Race advised Forgione about financing. When Race learned in a meeting with Orr, Forgione, and John Artuso that an ADT insider was involved, he refused to participate further in the deals.

The government also played a composite surveillance video tape that showed Vincent Artuso going into and coming out of the Ravenite Social Club on two dates in April 1988. The Ravenite Club served as a private venue in Manhattan where former Gambino crime family boss John Gotti met with other members of his "family."

Defense counsel raised concerns that the defendants had been convicted of RICO conspiracy because Vincent Artuso knew John Gotti. The trial court recognized—and addressed at several junctures in the trial—the danger of "everyone being swept into a . . . racketeering conviction, because one guy knows John Gotti . . . ." Because of that concern, the district court took special precautions during trial, such as excluding potential jurors who demonstrated any possible prejudice about organized crime; controlling the timing of testimony until after the government established sufficient predicate for its admission; terminating the playing of an audio tape made by Kasmann when its relevance became questionable; and sustaining the defense counsel's objection to the fifth Kasmann

16

tape that had nothing to do with the ADT/Tyco transaction but that the government offered as additional evidence of the "structure" of the Gambino family.

These and other efforts made by the district court to ensure that the defendants were not convicted "just because" Vincent Artuso knew John Gotti demonstrate the overall fairness of the trial. The government produced ample evidence tying each defendant to the South Florida crew of the Gambino family. Kasmann's contacts with known Gambino family members operating in South Florida and the hierarchy he described operating there established the existence of the South Florida crew and Vincent Artuso's role in it. The tape recordings Kasmann made with Peter Gotti and "Joe Joe" Corozzo corroborated Vincent Artuso's participation in the Gotti family business in South Florida.

Orr likewise played an integral role, both with Vincent Artuso and the ADT scheme. His involvement in trying to recruit Kasmann to invest in refinancing the ADT transactions, his other business dealings for Artuso, as well as his acknowledgment to Horton of Vincent Artuso's involvement with organized crime and his recruitment of the Artusos into the ADT scheme, place Orr squarely within the racketeering activity.

Despite their claim to be innocent businessmen, the government proved that

Forgione and John Artuso participated in the South Florida crew's scheme to defraud ADT. Far from being ancillary players in the deals, both Forgione and John Artuso were present at meetings where incriminating facts were discussed, including the fraudulent nature of the deals and the use of an insider to defraud ADT. Specifically as to John Artuso, the evidence established that he actively participated in the ADT deals by signing sales contracts and documents, attending and running meetings, and employing lawyers to structure the companies to conceal the profit flow to his father. John Artuso's actions on behalf of his father provided further evidence to allow the jury to conclude that he was member of the South Florida crew. *See United States v. Oreto*, 37 F.3d 739, 753 (1st Cir. 1994) (finding that evidence of a defendant's direct involvement in at least four transactions related to his father's loan sharking enterprise was sufficient to sustain both substantive RICO and RICO conspiracy convictions).

Likewise, Race's testimony established that Forgione was a member of an organized crime family, albeit a different one than Vincent Artuso, whom Kasmann identified as the head of the South Florida crew. Thus, the jury could have reasonably inferred that Forgione knew that, by participating in the ADT transactions, he associated himself with the South Florida crew. In addition, because Forgione testified unconvincingly that he was not involved in organized

18

crime, the jury was entitled both to reject his self-serving testimony and to use it as substantive evidence of his guilt. *See United States v. Hunt*, 526 F.3d 739, 745 (11th Cir. 2008) ("The defendant's own testimony can be considered by the jury as substantive evidence of his guilt.").

This evidence, taken in the light most favorable to the government, sufficiently establishes the existence of the South Florida crew and each defendant's involvement with it to support the jury verdict.

C.      Sixth Amendment Right to Impartial Jury

Vincent Artuso[3] argues that he was deprived of his Sixth Amendment right to an impartial jury because the district court failed *sua sponte* to dismiss prospective Juror # 45, who was ultimately the twelfth juror empaneled. During voir dire in response to a question, Juror # 45, along with other jurors, raised his hand to indicate that he might hold a defendant's failure to testify against him. No defense attorney questioned this juror further, nor did any defense attorney later challenge him for cause, although the judge did overrule a "for cause" challenge to a similarly-situated juror. No defendant raised any objection at trial to this juror's

---

[3] J. Artuso and Orr adopt this argument.

presence on the jury. Instead, Vincent Artuso now argues that the trial court committed reversible error by failing *sua sponte* to dismiss this juror, denying him his Sixth Amendment right to an impartial jury. We disagree.

The threshold issue to address is the proper standard of review to apply to the alleged error at trial. Despite Vincent Artuso's efforts to distinguish *United States v. Simmons*, 961 F.2d 183 (11th Cir. 1992) from the present case, the facts of that case are quite similar: jurors actually said a defendant's failure to testify would affect them; the defense did not raise an objection to these jurors; and the defense later tried and failed to advance a Sixth Amendment theory. *Simmons*, 961 F.2d at 184–86. As noted in *Simmons*, "this Court has never found that a potentially substantial claim raised for the first time on appeal justifies forsaking plain error review. This Court applies the plain error rule whenever a party has failed to bring the error to the attention of the district court." *Id*. at 185 n.1 (citations omitted). Thus, like the claim in *Simmons*, Vincent Artuso's claim that Juror # 45 was erroneously empaneled can only be subject to plain error review.

Because defense counsel failed to object at trial, we must grant the trial court's determination of juror impartiality great deference under the plain error doctrine, as recognized in *Simmons*:

> In the instant case, Simmons failed to object during the

lower court proceedings. We must therefore grant the lower court's finding of impartiality still greater deference under the plain error doctrine:

> "Plain errors are those seriously affecting the 'fairness, integrity, or public reputation of judicial proceedings.' Furthermore, the error must be both obvious and substantial. [Plain error is found] in exceptional circumstances where needed to prevent a miscarriage of justice."

*Simmons*, 961 F.2d at 185 (quoting *United States v. Solomon*, 856 F.2d 1572, 1575 (11th Cir. 1988) (alteration in original) (other citations omitted).

Vincent Artuso has not shown that the district court committed plain error in not *sua sponte* striking Juror # 45. No matter how emphatically Vincent Artuso argues that Juror # 45 "unequivocally" or "unambiguously" indicated his bias, such was not the case.

During voir dire, a defense attorney in his colloquy with Juror # 37 asked: "[S]o if a defendant didn't testify, you would find that fishy and you would hold that against him, correct?" Juror # 37 responded, "Probably yes." The attorney then asked, "No matter what the instruction is, that they don't have to, correct?" Prospective Juror # 37 replied, "Yes, Yeah." The defense attorney then asked the panel-members to raise their hands if they agreed with Juror # 37. Juror # 45 was one of ten prospective jurors who raised their hands. The transcript of voir dire

reflects no follow up questions were ever directed to Juror # 45.

Thereafter, all lawyers discussed their challenges at sidebar. Vincent Artuso's attorney challenged Juror # 13, who had raised his hand in agreement with Juror # 37. At that point, the district court asked Juror # 13 additional questions. As a result, no defense attorney raised a challenge "for cause" against Juror # 13, although he was the subject of a peremptory strike.

Also at side bar, Orr's attorney raised a "for cause" challenge to Juror # 38, who had also raised her hand in agreement with Juror # 37. The district court then stated in response: "Well, she raised her hand at one point. I think *without more* there's not a basis. I mean, I haven't given them instructions yet. I need to talk with them about the obligation not to consider the defendant not testifying. So I don't see a basis for cause on 38. Unless there is an agreement. Anybody else?" (Emphasis added). None of the attorneys asked to question Juror # 38 further, nor did they make any additional argument to excuse her for cause, although she was peremptorily struck.

When the lawyers discussed Juror # 45 at sidebar, no lawyer commented that he had raised his hand in agreement with Juror # 37's views about defendants who do not testify. No attorney ever asked Juror # 45 a question, asked the court to question him further, raised any concern about him, or moved to strike him for

22

cause. He became the twelfth juror empaneled because the defense attorneys had exhausted their peremptory challenges[4] and the government expressed no concern with him.

Vincent Artuso attempts to work around his failure to object to Juror # 45 by claiming that the lower court's ruling on Juror # 38 had a preclusive effect as to all similarly-situated jurors, but he fails to provide any legal support for this radical proposition. If Vincent Artuso legitimately thought that Juror # 45 should be struck for cause, he should have tried to do so; if he thought that his only basis for such a request was insufficient because of a prior ruling, and he kept quiet as a result, that strategic decision cannot be attributed to nonexistent rulings.

Although none of the numerous defense attorneys questioned Juror # 45 or raised any concerns about his impartiality, Vincent Artuso argues that the simple raising of a hand to a convoluted question demonstrated such "unequivocal" bias, which he argues the court on its own failed to rehabilitate, that the trial court *sua sponte* should have dismissed Juror # 45 for cause; and that failure to do so denied him a fair and impartial jury as required by the Sixth Amendment, entitling him to a new trial. If none of the defense attorneys was concerned about Juror # 45's

---

[4] The transcript reflects that the attorneys were well aware of how many peremptory strikes remained as they discussed the panel members.

raised hand, then the error, if any, "was not so conspicuous that the 'judge and prosecutor were derelict in countenancing it.'" *Simmons*, 961 F.2d at 186 (quoting *United States v. Bonavia*, 927 F.2d 565, 570 (11th Cir. 1991)).

Review of the entire lengthy voir dire shows the great effort by the district court, prosecutors, and attorneys to empanel a fair jury. In the absence of any objection, the Court finds that the trial court's failure to *sua sponte* remove Juror # 45 from the panel because of a raised hand in response to a complex, ambiguous question, without more, does not constitute plain error such as to require a new trial.


D.    Cross-examination of Forgione


Forgione took the witness stand to testify in his own defense. He denied any involvement with organized crime. On cross-examination, he again denied any ties to organized crime. On appeal, he contends that the trial court abused its discretion, entitling him to a new trial, when it allowed the prosecutor to inquire whether anyone had ever *accused* him of being a member of organized crime. We disagree.

When the prosecutor asked Forgione "Have you ever been accused of it?,"

24

referring to being involved with organized crime, defense counsel merely objected. When the court asked counsel to state a basis for the objection, counsel responded: "Has he been accused? By who?" Grammar aside, defense counsel presented no objection to the trial court based on relevance, Rule 401; undue prejudice, Rule 403; or any other legal ground, such as that the evidence was inadmissible as character or prior bad acts, Rule 404(a)-(b). Nor were the grounds for the objection clear from the context of the questioning.

Because counsel made no specific objection to the alleged evidentiary error at trial, we review for plain error. *United States v. Williford*, 764 F.2d 1493, 1502 (11th Cir. 1985). "We correct only for errors that are particularly egregious and that seriously affect the fairness, integrity or public reputation of judicial proceedings, and then only when a miscarriage of justice would result." *Id*.; *see also United States v. Schlei*, 122 F.3d 944, 973 (11th Cir. 1997) ("Although Schlei objected to the deliberate ignorance instruction at trial, he did not raise this specific contention before the district court . . . . Because no specific objection was made at trial, we review this claim for plain error."); *United States v. Dennis*, 786 F.2d 1029, 1042 (11th Cir. 1986) (reviewing for plain error where objection at trial to admissibility of evidence was based on relevancy and hearsay and not on ground urged on appeal).

Forgione, who was accused of affiliating with the South Florida crew in a criminal enterprise and testified on direct examination that he had no involvement with organized crime, was not unfairly prejudiced when the prosecutor cross-examined him about that assertion. This evidence is not "[e]vidence of a person's character or a trait of character" that was admitted "for the purpose of proving action in conformity therewith," Fed. R. Evid. 404(a); but even if it were, Forgione opened the door to its admission when on direct examination he testified that he had no ties to organized crime.

When Forgione first answered the prosecutor's question, he acknowledged "I'm Italian. I'm sure I've been accused of a lot of things." When pressed, he did admit that he had been accused a few months earlier of being a member of organized crime, but he denied the truth of the accusation; the prosecutor went no further. Furthermore, defense counsel had the last word in closing argument on this "innuendo": "And you know something? The government had the ability to put on a rebuttal case and if Mr. Forgione was a member of some kind of organized crime, they could have put it on."

When considering the record as a whole and the way both Forgione and his attorney defused the potential impact of the innuendo raised by the question, we find the error, if any, to be harmless.

26

## III. CONCLUSION

Having determined that none of the issues raised by the defendants merits reversal or new trial, we affirm the verdict.

**AFFIRMED.**